**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HSS Holding, LLC,[1] | ) | Case No. 13-12740 (BLS) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| Hospitality Staffing Solutions Group, LLC | ) | Case No. 13-12741 (BLS) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| Hospitality Staffing Solutions, LLC | ) | Case No. 13-12742 (BLS) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| IHS Staffing Services, LLC | ) | Case No. 13-12743 (BLS) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| IHS Hospitality Services, LLC, | ) | Case No. 13-12744 (BLS) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| Hospitality Staffing Solutions of Louisiana, | ) | Case No. 13-12745 (BLS) |
| L.L.C. | ) | |
| Debtor. | ) | |

---

[1]     The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: HSS Holding, LLC (7903); Hospitality Staffing Solutions Group, LLC (7921); Hospitality Staffing Solutions, LLC (8300); IHS Staffing Services, LLC (7545); IHS Hospitality Services, LLC (8258); Hospitality Staffing Solutions of Louisiana, L.L.C. (2862); Hospitality Staffing Solutions of Iowa, LLC (0578); Hospitality Staffing Solutions of Connecticut, LLC (2536); Hospitality Staffing Solutions of Indiana, LLC (2882); and Hospitality Staffing Solutions of Illinois, LLC (0721). The Debtors' address is 100 Glenridge Point Parkway, Suite 400, Atlanta, GA 30342.

| | |
|---|---|
| In re: ) | Chapter 11 |
| ) | |
| Hospitality Staffing Solutions of Iowa, LLC ) | Case No. 13-12746 (BLS) |
| ) | |
| Debtor. ) | |
| ) | |
| In re: ) | Chapter 11 |
| ) | |
| Hospitality Staffing Solutions of Connecticut,) LLC ) | Case No. 13-12747 (BLS) |
| ) | |
| Debtor. ) | |
| ) | |
| In re: ) | Chapter 11 |
| ) | |
| Hospitality Staffing Solutions of Indiana, ) LLC ) | Case No. 13-12748 (BLS) |
| ) | |
| Debtor. ) | |
| ) | |
| In re: ) | Chapter 11 |
| ) | |
| Hospitality Staffing Solutions of Illinois, ) LLC ) | Case No. 13-12749 (BLS) |
| ) | |
| Debtor. ) | Joint Administration Requested |

## MOTION OF THE DEBTORS FOR AN ORDER (A) AUTHORIZING DEBTORS TO PAY CERTAIN PREPETITION (I) WAGES, SALARIES, BONUSES AND OTHER COMPENSATION, (II) REIMBURSABLE EMPLOYEE EXPENSES AND (III) EMPLOYEE MEDICAL AND SIMILAR BENEFITS; (B) CONFIRMING THAT THE DEBTORS MAY CONTINUE PREPETITION EMPLOYEE PROGRAMS IN THE ORDINARY COURSE OF BUSINESS; AND (C) DIRECTING BANKS AND OTHER FINANCIAL INSTITUTIONS TO HONOR ALL RELATED CHECKS AND ELECTRONIC PAYMENT REQUESTS

The above-captioned debtors and debtors in possession (the "Debtors"), by and through their undersigned proposed counsel, hereby move (the "Motion"), pursuant to sections 105(a), 363(b)(1), 507(a)(4), 507(a)(5), 541(b) and 1129(a)(9)(B) of title 11 of the United States Code, 11 U.S.C. § 101 – 1532 (the "Bankruptcy Code") and Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for the entry of an order, substantially in the

form attached hereto, (a) authorizing, but not directing, the Debtors to pay certain prepetition (i) wages, salaries, bonuses and other compensation, (ii) reimbursable employee expenses and (iii) employee medical and similar benefits; (b) confirming that the Debtors may continue their prepetition employee programs in the ordinary course of business; and (c) authorizing and directing banks and other financial institutions to receive, process, honor and pay all checks presented for payment and electronic payment requests relating to the foregoing. In support of this Motion, the Debtors rely on the Declaration of A. Jeffrey Zappone in Support of Chapter 11 Petitions and First Day Motions and Applications (the "Zappone Declaration"), which is being filed contemporaneously herewith, and respectfully state as follows:

## Jurisdiction and Venue

1.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105(a), 363(b)(1), 507(a)(4), 507(a)(5), 541(b) and 1129(a)(9)(B) of the Bankruptcy Code and Bankruptcy Rule 6003.

## Background

### I.      The Debtors and their Businesses

3.      On October 24, 2013 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief with the Court under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases (the "Chapter 11 Cases") and, as of the date of the filing of this Motion, no official committees have been appointed.

4.    Hospitality Staffing Solutions Group, LLC ("HSS"), together with its affiliated debtors (the "Debtors"), is the largest provider of hospitality staffing services to hotels, resorts and casinos in the United States. Founded in 1990, HSS specializes in providing personnel for housekeeping services, as well as other hospitality services, including janitorial, stewarding, laundry and food and beverage services, and grounds maintenance. The company, which is headquartered in Atlanta, Georgia, provides services to customers in 76 markets in 35 states and has over 6,700 employees located throughout the United States.

5.    On September 15, 2010, HSS acquired substantially all of the assets and certain liabilities of Hospitality Staffing Solutions Group, Inc. (the "Acquisition"). Following the Acquisition, HSS discovered certain operational issues with the business, including issues surrounding employee verification and compliance issues. While HSS spent considerable time and effort in the years after the Acquisition addressing these operational issues, such issues caused HSS to lose certain contracts and associated revenue as other operators undercut HSS's pricing. This loss of revenue, coupled with the cost of rectifying the operational issues and the strain on revenue resulting from the sluggish national economy, created significant economic challenges for HSS. HSS's problems were also compounded by a workers' compensation audit for 2011 pursuant to which HSS's workers' compensation carrier asserted a claim in excess of $2.5 million.

## II.    The Debtors' Pre-Petition Credit Structure

6.    HSS and certain other Debtors are party to a Credit Agreement and a Collateral Agreement, each originally dated as of September 15, 2010, and certain other loan documents (as amended, supplemented or otherwise modified as of the date hereof, collectively the "Credit Facility") with a group of lenders (collectively the "Bank Group"), originally including The

PrivateBank and Trust Company ("PrivateBank"), who also served as Administrative Agent and Lead Arranger under the Credit Facility.

7.    HSS, Hospitality Staffing Solutions, LLC ("HSS Staffing"), IHS Staffing Services, LLC ("IHS Staffing") and IHS Hospitality Services, LLC ("IHS Hospitality" and together with HSS, HSS Staffing and IHS Staffing, the "Debtor Borrowers") are borrowers under the Credit Facility. The remaining Debtors – HSS Holding, LLC, Hospitality Staffing Solutions of Louisiana, L.L.C., Hospitality Staffing Solutions of Iowa, LLC, Hospitality Staffing Solutions of Connecticut, LLC, Hospitality Staffing Solutions of Indiana, LLC and Hospitality Staffing Solutions of Illinois, LLC (together, the "Guarantor Debtors") – are guarantors under the Credit Facility.

8.    The obligations to the Bank Group under the Credit Facility are secured by valid, binding, enforceable and perfected liens on substantially all of HSS's assets, subject to, without limitation, certain permitted liens (the "Prepetition Collateral"). As of the Petition Date, the aggregate principal amount outstanding under the Credit Facility is $22,910,994.40.

9.    The Debtor Borrowers are also parties to a Subordinated Note Purchase Agreement, dated as of September 15, 2010 (the "Subordinated Note Purchase Agreement"), pursuant to which the Debtor Borrowers issued notes in the initial aggregate principal amount of $18 million to Norwest Mezzanine Partners III, L.P. (the "Subordinated Notes"). The Subordinated Notes have a five and a half-year term, with no principal payments until maturity. Interest accrues on the Subordinated Notes at the per annum rate of 15% to be paid quarterly (of which up to 3% may be paid in kind, capitalized and added to the principal amount, and the remainder must be paid in cash). As of the Petition Date, the aggregate principal amount due under the Subordinated Notes is $22,897,537.89. The obligations under the Subordinated Notes

are guaranteed by the Guarantor Debtors, are unsecured and are subordinated in priority and right of payment to the obligations under the Credit Facility.

10.     As part of the Acquisition, HSS also entered into a $7 million unsecured note with certain sellers (the "Seller Note"). As of the Petition Date, the aggregate principal amount outstanding on the Seller Note is $8,648,385.85. The Seller Note is unsecured and is subordinated in priority and right of payment to the obligations under the Credit Facility and the Subordinated Notes.

11.     Similarly, in connection with the Acquisition, HSS entered into a $3.25 million unsecured convertible note with HSS Investment, LLC and Frontenac HSS Investor, Inc. (the "Convertible Note"). As of the Petition Date, the aggregate principal amount outstanding on the Convertible Note is $3,816,323.63. The Convertible Note is unsecured and is subordinated in priority and right of payment to the obligations under the Credit Facility and the Subordinated Notes.

12.     On October 11, 2013, the Debtors were notified that the Bank Group sold its debt and assigned the Credit Facility to SG Distressed Fund, LP, LittleJohn Opportunities Master Fund, LP, LJC Investments I, LLC and their respective investment affiliates (together, "Investors").

13.     The Debtors estimate that they have approximately $2.0 million in trade debt.

**III.    The Debtors' Restructuring and Marketing Efforts to Date**

14.     By April of 2013, the Borrower Debtors had defaulted under the Credit Facility and the Bank Group imposed a payroll reserve which further restricted the Borrower Debtors' ability to fund operations. The Debtors' equity sponsor was not prepared to put additional capital into the business without relief from the obligations due under the Credit Facility,

alternative sources of financing were unavailable and the Bank Group was not prepared to fund an over advance.

15.    On June 19, 2013, the Debtors and the Bank Group entered into a Forbearance Agreement and Fourth Amendment to Credit Agreement (the "Forbearance Agreement"), which expired on August 31, 2013.  Under the terms of the Forbearance Agreement, the Bank Group agreed to forbear from exercising its rights and remedies with respect to existing defaults under the Credit Facility pursuant to certain terms and conditions, including that the Debtors hire an investment banker to explore options such as the sale of substantially all of their assets.

16.    On July 16, 2013, HSS engaged Duff & Phelps Securities, LLC ("D&P") as its exclusive investment banker.  Following its engagement, D&P commenced an extensive sale process.  In August 2013, D&P began contacting potential strategic and financial purchasers.  Of the 150 parties contacted, 44 potential purchasers signed nondisclosure agreements.  Moreover, of those parties receiving confidential information, 9 submitted letters of intent.  A data room was created to allow potential purchasers to conduct due diligence.  D&P, along with the Debtors and their counsel, and in conjunction with the Bank Group, carefully evaluated and compared the offers to determine which offer was the highest and best bid.

17.    Notwithstanding the preliminary interest generated from the marketing process, the Debtors were unable to negotiate with the Bank Group a further extension of the forbearance agreement and the Bank Group made it clear that it would not fund a sale process under section 363 of the Bankruptcy Code, or any process beyond October 2013.  Instead,  the Bank Group favored a "private sale" under Article 9 of the Uniform Commercial Code as soon as possible.  The Investors, on the other hand, were the only party who proposed to acquire the Bank Group debt and fund a bankruptcy 363 sale process, with the Investors serving as stalking horse bidder.

18.     On October 11, 2013, the Investors acquired the debt owed to the Bank Group and the Debtors entered into exclusive negotiations with the Investors to fund both the ongoing business operations and a competitive open sale process under section 363 of the Bankruptcy Code in which HS Solutions Corporation ("Solutions"), a newly created company affiliated with the Investors, would serve as stalking horse bidder by way of a credit bid. Given the Debtors' financial position, the need for further due diligence by certain other potential purchasers, the contingencies contained in such potential purchasers' respective expressions of interest and the desire for employee stability, the Debtors concluded that the best way to maximize value for their constituents would be to file for bankruptcy protection with the goal of conducting an open sale process that includes Solutions as stalking horse bidder and enables all parties interested in acquiring the Debtors' assets to participate.

A.     **Employees, Programs and Benefits**

19.     As of the Petition Date, the Debtors employ approximately 6,920 employees (the "Employees"). Of these 6,920 Employees, 3,907 (56%) are full-time. The Employees can be divided into two groups: (i) Employees who either work in the corporate office in shared services, financial, sales, marketing or human resources positions, or Employees who serve at the level of a supervisor or above in the field, such as area managers and accounts supervisors (together, "Corporate Employees"); and (ii) assignment-based Employees who are employed to work in the field at hotels, casinos or resorts ("Field Employees"). The Debtors employ 222 Corporate Employees and 6,698 Field Employees. Of the 222 Corporate Employees, 49 Employees are paid on an hourly basis while 173 are salaried. All Field Employees are paid on an hourly basis. None of the Debtors' Employees are unionized.

20.     As a staffing business, the Employees perform a variety of critical functions in serving the Debtors' many customers, including housekeeping, food and beverage services,

laundry services, grounds maintenance, stewarding and janitorial services. The Debtors also rely on field supervisors to ensure that staffing needs are met efficiently and effectively, that clients are satisfied and that day-to-day operations run smoothly. The Employees further perform various clerical, administrative and managerial functions for the Debtors that are necessary for continued operations.

21.    Just as the Debtors depend on their Employees to operate, the Employees depend on the Debtors. The vast majority of the Debtors' Employees rely on their compensation and benefits to continue to pay their daily living expenses, and these Employees will be exposed to significant financial difficulties if the Debtors are not permitted to pay them their full unpaid compensation, benefits and reimbursable expenses in the ordinary course of business.

22.    To minimize the personal hardship that the Employees would suffer if prepetition Employee-related obligations are not paid when due or as expected, and to maintain morale and stability in the Debtors' workforce during this critical time, the Debtors, by this Motion, seek authority to pay and honor, subject to certain limitations, certain prepetition claims for, among other items, wages, salaries, commissions, bonuses and other compensation, expense reimbursement, federal and state withholding taxes and other amounts withheld (including garnishments and taxes), health benefits, insurance benefits, workers' compensation benefits, paid time off, life insurance, long-term disability coverage and all other benefits that the Debtors have historically provided in the ordinary course of business (collectively, and as more fully described below, the "Employee Obligations"), and to pay all costs incident to the foregoing. In an abundance of caution, the Debtors request the right, subject to the consent of the lender under the Debtors' proposed debtor-in-possession financing facility, to modify, change and discontinue any of their employee compensation programs, policies and benefits, and to implement new

programs, policies and benefits in the ordinary course of business during these Chapter 11 Cases in their sole discretion without the need for further Court approval.

**B.    Employee Obligations**

**1.    Unpaid Compensation**

23.    In the ordinary course of business, the Debtors incur payroll obligations to the Employees.    Such obligations comprise wages, salaries and, for certain Employees, commissions.    The Debtors pay all Employees on a bi-weekly basis, one week in arrears. Approximately 96% of the Corporate Employees receive payment of their wages or salaries by direct deposit through electronic transfer of funds directly to Employees' accounts ("Direct Deposit"), with the balance receiving wages or salaries through payroll checks.    Likewise, approximately 70% of the Field Employees receive their wages via Direct Deposit or through a payroll card that is loaded through the automatic clearing house network ("ACH") in a manner similar to a Direct Deposit.  The remaining 30% of the Debtors' Field Employees receive their wages through payroll checks.    On average, the Debtors have gross payroll expenses of approximately $908,956 per month, or $227,239 per week for Corporate Employees, and approximately $7,104,048   per month, or $1,776.012 per week for Field Employees.    The Debtors' last gross payroll for the salaried Employees, in the approximate amount of $419,366 (including all employee deductions, withholding and employer-paid taxes and benefits) was paid on October 18, 2013 for the two-week pay period ending October 13, 2013.  The Debtors' last gross payroll for the hourly Employees in the approximate amount of $3,909,279 was paid on October 18, 2013 for the pay period ending October 13, 2013.

24.    In the ordinary course of business, the Debtors incur compensation obligations to temporary agencies for services provided by temporary employees (the "Temporary Agency Fees").  The Debtors pay approximately $45,000 per month for night shift janitorial services for

three hotel properties in Chicago in which the hotel owners have longstanding relationships with the janitorial services company. The Debtors have confirmed that the use of such services at these Chicago hotels is cost effective and enables the Debtors to continue their relationship with these customers. The Debtors further pay approximately $16,000 per month to a temporary agency for work performed by three temporary employees currently providing billing and accounts payable services for the Debtors.

25. In addition, certain of the Debtors' Employees – specifically account supervisors, area managers, field vice presents and the Vice President of Sales – are responsible for helping to generate new sales and growth for the Debtors at client sites each year. To incentivize these Employees to generate such sales, the Debtors, in addition to providing these Employees with base wages or salary, allow these Employees to participate in an annual incentive program under which the Employees can earn a commission on any new business generated (the "Commissions"). The Debtors estimate that as of the Petition Date, $18,212 in Commissions has accrued.

26. Similarly, bonuses may be available to area managers and field vice presidents in a given year based on profits earned in a territory or market ("Bonuses"). The Debtors estimate that as of the Petition Date, $85,133 in Bonuses has accrued.

27. Because the Employees are paid in arrears, as of the Petition Date, the Employees have not been paid all of their prepetition wages and compensation. Additionally, some Employees may be entitled to compensation because (a) discrepancies may exist between the amounts paid and the amounts that should have been paid and (b) some checks issued to Employees prior to the Petition Date may not have been presented for payment or may not have

cleared the banking system and, accordingly, have not been honored and paid as of the Petition Date (the "Uncashed Checks").

28.    The Debtors estimate that, as of the Petition Date, approximately $2,822,924 in prepetition accrued wages, salaries, Temporary Agency Fees, Commissions, Bonuses, expense reimbursements and other compensation (but excluding vacation pay) earned prior to the Petition Date remains unpaid (together with the Uncashed Checks, the "Unpaid Compensation").

29.    The Debtors submit that no Employees are owed Employee Unpaid Compensation in excess of the $11,725 statutory priority cap imposed by sections 507(a)(4) and (5) of the Bankruptcy Code except for the Debtors' President, Rick Holliday.  To the extent Mr. Holliday's Unpaid Compensation or any other Employee's Unpaid Compensation exceeds the statutory priority cap imposed by sections 507(a)(4) and (5) of the Bankruptcy Code, such payments would be de minimis.[2]

### 2.    Deductions and Withholdings

30.    During each applicable pay period, the Debtors routinely deduct certain amounts from Employee paychecks, including, without limitation, (a) garnishments, child support, and similar deductions, and (b) other pre-tax and after-tax deductions payable pursuant to certain of the Employee benefit plans discussed herein (such as an Employee's legally ordered deductions, health and dental insurance and other, miscellaneous deductions) (collectively, the "Deductions").  The Debtors forward the amount of the Deductions to the appropriate third-party recipients.  On average, the Debtors have deducted approximately $24,144 from the Employees' paychecks per each bi-weekly payroll.  Due to the commencement of the Chapter 11 Cases, however, certain Deductions that were deducted from Employees' earnings may not have been

---

[2]    The Debtors estimate that the extent to which Mr. Holliday's Unpaid Compensation exceeds the priority wage cap imposed under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code is less than $300.

forwarded to the appropriate third-party recipients prior to the Petition Date. The Debtors estimate that as of the Petition Date, $15,521 in Deductions will be due to the appropriate third-party recipients. Accordingly, the Debtors request authority, but not direction, to forward any unpaid Deductions to the appropriate third party recipients and to continue to forward these prepetition Deductions to the applicable third party recipients on a postpetition basis, in the ordinary course of business, as routinely done prior to the Petition Date.

31.     Further, the Debtors are required by law to withhold from an Employee's wages amounts related to federal, state and local income taxes, social security and Medicare taxes for remittance to the appropriate federal, state or local taxing authority (collectively, the "Withheld Amounts"). The Withheld Amounts are approximately $554,532 per each bi-weekly payroll. The Debtors must then pay social security and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance (collectively, the "Employer Payroll Taxes"). The Employer Payroll Taxes are approximately $384,049 per bi-weekly payroll.

32.     Prior to the Petition Date, the Debtors withheld the appropriate amounts from Employees' earnings for the Withheld Amounts and the Employer Payroll Taxes (collectively, the "Payroll Taxes"), but such funds may not yet have been forwarded to the appropriate taxing authorities. The Debtors estimate that as of the Petition Date, $201,110 in Payroll Taxes (which comprise the Withheld Amounts and Employer Payroll Taxes) have not been forwarded to the appropriate taxing authorities. The Debtors request authority, but not direction, to forward any outstanding Payroll Taxes to the appropriate third parties, and to continue to honor and process the prepetition payments for Payroll Taxes on a postpetition basis, in the ordinary course of business, as routinely done prior to the Petition Date.

**3.      Honoring Checks for, and Payment of, Reimbursable Expenses**

33.     Prior to the Petition Date, and in the ordinary course of their businesses, the Debtors reimburse Corporate Employees for certain reasonable and customary expenses incurred on behalf of the Debtors in the scope of their employment (the "Reimbursable Expenses").  The Reimbursable Expenses are paid on a bi-weekly basis and are included in an Employee's paycheck as a non-taxable business expense.  Reimbursable Expenses include reimbursements for reasonable business travel that are incurred while on assignment, including the actual costs of travel, meals, lodging, and other expenses directly related to accomplishing business travel objectives.

34.     As of the Petition Date, the Debtors have approximately $21,989 in pending requests for expense reimbursements.  In addition, it is possible that certain Employees may have incurred prepetition expenses for which they have not yet submitted requests for reimbursement and will submit such requests to the Debtors after the Petition Date.  The Debtors estimate that the amount of postpetition requests for reimbursement of prepetition expenses will not exceed $50,000.

35.     Reimbursable Expenses are all incurred on the Debtors' behalf and with the understanding that they will be reimbursed.  Accordingly, to avoid harming Employees who may have incurred the Reimbursable Expenses, the Debtors request authority, to be exercised in their sole discretion, to (a) continue paying Reimbursable Expenses in accordance with prepetition practices, including those Credit Card Obligations (defined below) that constitute Reimbursable Expenses, (b) subject to the consent of the lender under the Debtors' proposed debtor-in-possession financing facility, modify their prepetition policies relating thereto as they deem appropriate and (c) pay all Reimbursable Expenses that relate to the prepetition period and are submitted to the Debtors postpetition.

## C.    Employee Benefits

36.    The Debtors offer Corporate Employees the ability to participate in a number of insurance and benefit programs, including medical and dental plans, vacation time and other paid leaves of absence, workers' compensation, life insurance, accidental death and dismemberment insurance, and long-term and short-term disability insurance (collectively, the "Employee Benefit Programs"). Field Employees are also entitled to participate in certain Employee Benefit Programs, as explained below.

37.    Notably, the Debtors use Liazon Corporation ("Liazon"), a benefits exchange corporation, to provide Employee Benefit Programs to Corporate Employees (the "Liazon Benefits Exchange Program"). In connection with this benefits exchange program, the Debtors contribute a certain amount for each employee to use towards the purchase of available benefit plans. The Debtors' monthly contributions to Corporate Employees using the Liazon Benefits Exchange Program for the year 2013 are as follows:

| Employee Only | $351.66 |
| Employee and Spouse | $538.55 |
| Employee and Children | $538.55 |
| Employee and Family | $637.56 |

38.    Approximately 120 Corporate Employees participate in the Liazon Benefits Exchange Program, and the Debtors' monthly contributions to such Employees cost the Debtors approximately $60,475 per month.

### 1.    Medical and Dental Benefits

39.    The Debtors offer health insurance to their Employees for medical and dental coverage (as specified below collectively, the "Health Insurance").

### (a)    Health Insurance for Corporate Employees

40.    A variety of Health Insurance benefits are offered to the Debtors' Corporate
Employees through Liazon:

(i)    ***Medical Plans.***  The Debtors offer 5 types of medical plans (the "Corporate Medical Plans") through Liazon for Corporate Employees, all of which are administrated by United HealthCare Insurance Company ("United HealthCare").  Approximately 109 of the Debtors' Corporate Employees participate in the Corporate Medical Plans.  Subject to various co-pays, deductibles and limitations, Employees who participate in the Medical Plans are provided with coverage for, *inter alia*, routine physical examinations, diagnostic services, diabetes services, maternity and pediatric services and inpatient and outpatient hospital services. Rates under the Corporate Medical Plans depend on the level of coverage purchased and whether other family members are included in the plan. Rates further range from approximately $250 per month to approximately $1,300 per month.

(ii)    ***Dental Plans.***  The Debtors offer 3 types of dental plans (the "Corporate Dental Plans") through Liazon for Corporate Employees, all of which are administrated by MetLife Insurance Company ("MetLife"): (i) a "value" plan, which covers up to 60% of the costs of basic dental services and 100% of preventative services; (ii) a "basic" plan, which covers up to 60% of basic dental services, 40% of major services such as bridges and crowns, and 100% of preventative services; and (iii) an "enhanced" dental plan, which covers up to 80% of basic dental services, 50% of major services, 50% of orthodontia services and 100% of preventative services.  Rates under the Corporate Dental Plans depend on the type of plan selected and whether additional family members are included in the plan.  Approximately 105 of the Debtors' Corporate Employees participate in the Corporate Dental Plans.

(iii)    ***Vision Plan.***  The Debtors offer a vision plan (the "Corporate Vision Plan") through Liazon, which is administered by United HealthCare.  Approximately 83 Corporate Employees have enrolled in the Corporate Vision Plan, which provides coverage for routine exams, lenses and frames, subject to certain co-pays and allowances. Rates under the Corporate Vision Plan, which range from approximately $8.00 per month to approximately $23.00 per month, depend on the level of coverage and whether employee family members are included in the plan.

(iv) **_Miscellaneous Wellness Programs_**. The Debtors offer a variety of health and wellness programs through Liazon (the "Wellness Programs"). The Wellness Programs include: (i) a "Healthy Start" program administered by Wellness By Choice ("WBC"), which provides enrolled employees with an individualized wellness program for approximately $8.00 per month; (ii) a "Healthy Coach" program administered by WBC, which provides a health coach to work with employees to develop a wellness program for $25.00 per month; (iii) a "Healthy Directions" program administered by WBC for approximately $42.00 per month, which provides a personal health coach and a home testing lab kit; and (iv) a "Consult a Doctor" program administered by MetLife, which enables employees to contact a doctor at any time for $5.00 to $40.00, depending on the urgency of the appointment. Approximately 13 Corporate Employees are enrolled in the Wellness Programs.

(v) **_Health Savings Account._** Lastly, the Debtors offer Corporate Employees the opportunity to create a Health Savings Account through Liazon, which account is administered by Health Equity, Inc. Health Savings Accounts are savings and spending accounts that can be used for building health savings or for paying for qualified healthcare expenses. There is a $4.00 monthly fee required to maintain a Health Savings Account and maximum contributions to the account are $3,250 for a single person or $6,450 for a family. To be eligible for a Health Savings Account, Corporate Employees must be enrolled in a qualifying "high deductible health plan." As of the Petition Date, approximately 5 Corporate Employees maintain Health Savings Accounts.

**(b)    Health Insurance for Field Employees**

(i) **_Medical_**. The Debtors offer Field Employees a medical plan through Cigna (the "Field Employee Medical Plan"). The Field Employee Medical Plan is funded 100% by Field Employees (there are no employer contributions) and thus there is no cost to the Debtors in offering this plan. The plan provides coverage for, _inter alia_, routine physical examinations and diagnostic services, subject to various co-pays, deductibles and limitations, and rates under the plan range from approximately $30.00 to $215.00 per month depending on the level and type of coverage and whether additional family members are included in the plan. The Debtors estimate that approximately 81 Field Employees are enrolled in the Field Employee Medical Plan.

(ii) **_Dental/Vision Plan._** The Debtors also offer Field Employees a combined dental and vision plan through Cigna (the "Field

Dental/Vision Plan"), which is funded 100% by participating Field Employees and which provides basic dental and vision services for rates ranging from $20.00 to $57.00 per month. Approximately 12 Field Employees participate in the Field Dental/Vision Plan.

41.     By this Motion, the Debtors seek authority, in their sole discretion, to (a) continue the Health Insurance for Employees in the ordinary course of business, (b) continue making the above-described contributions to such benefit programs, and (c) pay any amounts related thereto, and any other amounts on account of any premiums, claim amounts and administration fees to the extent that they remain unpaid as of the Petition Date.

### 2.    Paid Time Off and Other Leaves of Absence

42.     The Debtors provide paid time off to their Corporate Employees ("PTO") for vacation, illness, injury, charity work and personal business. PTO combines traditional sick leave and vacation plans into one flexible, paid time-off policy. The amount of PTO available to a particular Corporate Employee and the rate at which such PTO accrues is generally determined by the Employee's length of employment and whether the Employee is a part-time or full-time Employee. All PTO earned during the calendar year must generally be used by December 31st of that year; although up to five days of accrued PTO may be carried over into the following year so long as it is used before March 31st of that year. Also, no PTO is earned while an employee is on an unpaid leave of absence or short- or long-term disability leave. Although the Debtors estimate that approximately $225,950 of earned but unused PTO will have accrued as of the Petition Date, the Debtors believe that Employees will use such PTO in the ordinary course of business.

43.     The Debtors also provide Corporate Employees with 7 holidays as a paid time-off benefit ("Holidays"). Based on the Debtors' books and records, the Debtors do not believe that

any Holiday has accrued as of the Petition Date; however, the Debtors believe that Employees will use such Holidays in the ordinary course of business.

44.    Next, the Debtors allow their Employees to take certain leaves of absence for personal reasons, many of which are required by law ("Leaves of Absence"). Leaves of Absence include military leave and leave provided for under the Family and Medical Leave Act, which is provided for all Employees, and which includes leave for pregnancy, adoption and support of a family member in the military. The Debtors also provide Corporate Employees with up to two days of paid bereavement leave, one day of paid jury service, paid witness service and up to two hours of paid time for voting. Additionally, Corporate Employees may receive unpaid personal days ("Personal Days") each year to take care of personal matters, which may be granted by the Debtors at their sole discretion. Corporate Employees may receive up to 90 Personal Days every two years.

45.    By this Motion, the Debtors request that they be authorized, but not directed, to continue to honor their PTO, Holidays, Leaves of Absence and Personal Days policies in the ordinary course of business, and to honor and pay any prepetition amounts related thereto. Moreover, the Debtors anticipate that their Employees will utilize any accrued PTO, Holidays, Leaves of Absence and Personal Days in the ordinary course of business, which will not create any material cash flow requirements beyond the Debtors' normal payroll obligations.

### 3.    Relocation Assistance

46.    The Debtors offer relocation benefits ("Relocation Assistance") to any transferred or newly hired Corporate Employee who must relocate in order to reside within 100 miles of a new place of work. The Company reimburses relocation expenses only if advance approval is obtained. Moreover, the expenses must be reasonable and satisfactory proof of the expenses

must be provided. The Debtors' books and records show that no amounts have accrued for Relocation Assistance as of the Petition Date.

### 4.    Educational Financial Assistance Program

47.    The Debtors provide an educational financial assistance program (the "Educational Assistance Program") to eligible full-time Corporate Employees who have completed three months of service. In order to receive and maintain this benefit, Employees must remain on the Debtors' active payroll and perform their job responsibilities satisfactorily through completion of each course. Moreover, courses that are part of a degree, licensing, or certification program must be related to current job duties, or a foreseeable future position in the organization, in order to be eligible for educational assistance. If a participating Employee voluntarily leaves the company within one year of the last educational assistance payment, the amount of the payment will be considered a loan and must be repaid by the Employee.

48.    Currently, there are no Corporate Employees participating in the Educational Assistance Program and thus no outstanding reimbursement amounts will have accrued as of the Petition Date. By this Motion, the Debtors request that they be authorized, but not directed, to continue their Educational Assistance Program in the ordinary course of business.

### 5.    Additional Employee Benefits

#### a.    Life Insurance, Supplemental Life Insurance, Accidental Death and Dismemberment Insurance and Long- and Short-Term Disability Benefits

49.    The Debtors offer their Employees life insurance coverage ("Life Insurance") through two insurers, depending on whether an Employee is a Field Employee or a Corporate Employee. Field Employees may purchase primary term life insurance through Cigna for rates ranging from approximately $4.00 to $8.00 per month, depending on the level of coverage sought. Approximately 12 Field Employees have purchased this Life Insurance policy.

50.    Using the Liazon Benefits Exchange Program, full-time Corporate Employees may purchase primary and supplemental term life insurance coverage through MetLife. In addition, accidental death and dismemberment insurance through MetLife ("AD&D Coverage") is offered to full-time Corporate Employees as part of the basic Life Insurance plan. Corporate Employee costs for Life Insurance/AD&D Insurance vary depending on the type of coverage sought and the age of the employee. The Debtors estimate that approximately 61 Corporate Employees have purchased Life Insurance and AD&D Coverage through the Liazon Benefits Exchange Program.

51.    Next, using Liazon, the Debtors offer their full-time Corporate Employees with long-term disability benefits administered by MetLife (the "Long-Term Disability Benefits"). Employee costs for Long-Term Disability Benefits vary depending on the type of coverage sought and the age of the employee. The Debtors estimate that approximately 48 Corporate Employees are enrolled in the MetLife Long-Term Disability Benefits plan. Under this plan, an Employee may receive 60% of his or her pre-disability salary per month, not to exceed $6,000 per month.

52.    Finally, through the Liazon Benefits Exchange Program, the Debtors offer their full-time Corporate Employees short-term disability benefits through MetLife (the "Short-Term Disability Benefits"). Eligibility for Short-Term Disability Benefits requires that an employee have worked at least 30 hours per week. Under this policy, an Employee may receive 60% of his or her gross weekly earnings or $1,000, whichever is less, and benefits will continue up to a maximum of 25 weeks. The Debtors estimate that approximately 31 Corporate Employees are enrolled in the MetLife Short-Term Disability Benefits plan.

### b.    Accident Insurance

53.    The Debtors offer their Corporate Employees basic and enhanced accident insurance through All-State Life Insurance Company (the "Accident Insurance"). Under this policy, an Employee may purchase different coverage options for accidental death, dismemberment, dislocation and fracture and hospital confinement, among other things. The Debtors estimate that approximately 27 Corporate Employees are enrolled in the Accidents Insurance plan, which is offered through Liazon.

### c.    Critical Illness Insurance

54.    Next, through the Liazon Benefits Exchange Program, the Debtors offer their Corporate Employees critical illness insurance through All-State Life Insurance Company ("Critical Illness Insurance"). This policy pays 100% of the purchased coverage level for such covered illnesses as invasive cancer, heart attack, stroke, organ transplant, Alzheimer's Disease and end state renal failure. The plan also pays 25% of the purchased coverage level for coronary artery by-pass surgery or a diagnosis of non-invasive cancers. The Debtors estimate that approximately 12 Corporate Employees are enrolled in the Critical Illness Insurance plan.

### d.    Pet Insurance

55.    Corporate Employees may use the Liazon Benefits Exchange Program to purchase pet insurance through Veterinary Pet Insurance (the "Pet Insurance"). Coverage costs depend on the age and species of the pet. Employees work with Liazon directly in purchasing Pet Insurance through the benefits exchange program.

### e.    Social Security

56.    As indicated above, the Debtors deduct social security contributions from the bi-weekly wages of all Employees and remit such funds to the appropriate government agency. For Corporate Employees, the Company also matches contributions dollar for dollar ("Social

Security Payments"), thereby paying half the cost of future social security benefits for Corporate Employees. The Debtors' Social Security Payments are included in its payment of Employer Payroll Taxes. As of the Petition Date, the Debtors owed approximately $116,098 in Social Security Payments.

### f.    Credit Cards

57.    The Debtors currently maintain six company credit cards (the "Credit Card Obligations"), four of which are American Express ("Amex") cards and two of which are Mastercards. One of the Amex cards is used solely for accounts payable expenses, the second Amex card is used solely for company travel expenses and the remaining two Amex cards are held by the Debtors' Chief Financial Officer and President, respectively. The Debtors intend to close the two Master Card accounts as of the Petition Date and open an fifth Amex card for use by the Debtors' Vice President of Operations. The Debtors do not believe that any amounts are owed in connection with Credit Card Obligations as of the Petition Date.

### Relief Requested

58.    By this Motion, the Debtors seek authority, subject to certain limitations, to pay and honor, in the ordinary course of business and in their sole discretion, prepetition claims and obligations related to (a) Uncashed Checks, (b) Unpaid Compensation, (c) Deductions and Payroll Taxes, (d) Reimbursable Expenses, and (e) the Employee Benefit Programs, all as defined and described herein.

59.    In addition, the Debtors request that banks and other financial institutions be authorized and directed to receive, process, honor and pay all checks presented for payment and electronic payment requests relating to the foregoing, whether such checks were presented or electronic requests were submitted prior to or after the Petition Date. The Debtors also request

that all such banks and financial institutions be authorized to rely on the Debtors' designation of any particular check or electronic payment request as appropriate pursuant to this Motion.

60.    Courts in complex chapter 11 cases have previously approved the same or substantially similar relief as requested herein. *See, e.g., In re IPC Int'l Corp.*, Case No. 13-12050 (MFW) (Bankr. D. Del. Sept. 3, 2013); *In re Oncure Holdings, Inc.*, Case No. 13-11540 (KG) (Bankr. D. Del. July 24, 2013); *In re Highway Technologies, Inc., et al.,* Case No. 13-11326 (KJC) (Bankr. D. Del. May 23, 2013); *In re SSI Group Holding Corp.*, Case No. 11-12917 (MFW) (Bankr. D. Del. Sept. 15, 2011); *In re DSI Holdings, Inc.*, Case No. 11-11941 (KJC) (Bankr. D. Del. June 28, 2011); *In re Perkins & Marie Callender's Inc.*, Case No. 11-11795 (KG) (Bankr. D. Del. June 14, 2011); *In re Universal Building Products, Inc.*, Case No. 10-12453 (MFW) (Bankr. D. Del. Aug. 5, 2010); *In re Philadelphia Newspapers, LLC*, No. 09-11204 (JFK) (Bankr. E.D. Pa. Feb. 24, 2009); *In re Tropicana Entm't, LLC*, No. 08-10856 (KJC) (Bankr. D. Del. May 6, 2008); *In re Leiner Health Prods. Inc.*, No. 08-10446 (KJC) (Bankr. D. Del. April 9, 2008); *In re Wickes Holdings, LLC*, No. 08-10212 (KJC) (Bankr. D. Del. Feb. 5, 2008); *In re Tweeter Home Entm't Group, Inc.*, No. 07-10787 (PJW) (Bankr. D. Del. June 13, 2007); *In re Pope & Talbot, Inc.*, No. 07-11738 (CSS) (Bankr. D. Del. Nov. 21, 2007); *In re Hancock Fabrics, Inc.*, No. 07-10353 (BLS) (Bankr. D. Del. March 22, 2007).

<u>**Basis for Relief**</u>

**A.    Sufficient Cause Exists for the Court to Authorize the Debtors to Honor Employee Obligations**

61.    The Debtors seek authority to satisfy their Employee Obligations to ensure the continued operation of the Debtors' businesses and to maintain the morale of their Employees, many of whom would suffer extreme personal hardship and financial difficulty if they are not paid. In addition, the Employee Benefit Programs are an important part of each Employee's total

compensation. Any indication that the Employee Obligations may not be honored will prove detrimental to the Debtors' proposed Section 363 sale process.

62.    Paying prepetition wages and employee benefits will benefit the estates and their creditors by allowing the Debtors' business operations to continue without interruption. The Debtors believe that without the requested relief, their Employees may seek alternative employment opportunities, perhaps with the Debtors' competitors. Such a development would deplete the Debtors' workforce, hindering the Debtors' ability to meet their obligations and damaging client relationships. Furthermore, the loss of valuable Employees and the resulting recruiting of new employees that would be necessary to find replacements would not only be distracting but would also be detrimental to the Debtors' ability to continue their business operations during these Chapter 11 Cases and to effectively market their assets for sale at the highest and best value. Also, if the Debtors lose valuable Employees, they will incur recruiting expenses in locating replacement workers. Accordingly, there can be no doubt that the Debtors must do their utmost to retain their workforce by, among other things, continuing to honor all wage, benefit and related obligations, including the Employee Obligations.

1.    **Payment is Appropriate Pursuant to Section 105(a) of the Bankruptcy Code.**

63.    The Court may authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code. Section 105(a) of the Bankruptcy Code codifies the inherent equitable powers of the bankruptcy courts and empowers a bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Under section 105(a), courts may permit pre-plan payments of prepetition obligations when essential to the continued operation of a debtor's business. Specifically, the Court may use its power under section 105(a) to authorize payment of prepetition obligations pursuant to the "doctrine of necessity."

64.     The United States Court of Appeals for the Third Circuit has recognized the "necessity of payment" doctrine in *In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981). There, the Third Circuit held that a court could authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor. *Id.* (stating that court may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment"); *see also In re Penn Cent. Transp. Co.*, 467 F.2d 100, 102 n.1 (3d Cir. 1972) (holding that the necessity of payment doctrine permits "immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims have been paid"); *In re Just for Feet, Inc.*, 242 B.R. 821, 824-845 (Bankr. D. Del. 1999) (noting that, in the Third Circuit, debtors may pay prepetition claims that are essential to continued operation of business); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191-92 (Bankr. D. Del. 1994) (same).

65.     The rationale for the necessity of payment doctrine – the rehabilitation of a debtor in reorganization cases – is "the paramount policy and goal of Chapter 11." *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989); *see also Just For Feet*, 242 B.R. at 826 (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization"); *In re Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[P]ayment by a debtor-in-possession of pre-petition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code", but "[a] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023

(Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of tool-makers as "necessary to avert a serious threat to the Chapter 11 process"); *Burchinal v. Cent. Wash. Bank (In re Adams Apple, Inc.)*, 829 F.2d 1484, 1490 (9th Cir. 1987) (recognizing that allowance of "unequal treatment of pre-petition debts when necessary for rehabilitation" is appropriate); *Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateauguay Corp.)*, 80 B.R. 279, 287 (S.D.N.Y. 1987) (authorizing payment of prepetition workers' compensation claims on grounds that the fundamental purpose of reorganization and equity powers of bankruptcy courts "is to create a flexible mechanism that will permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately"); 3 Collier On Bankruptcy § 105.04[5][a] (15th ed. rev.) (discussing cases in which courts have relied on the "doctrine of necessity" or the "necessity of payment" rule to pay prepetition claims immediately).

66.     Courts also have permitted postpetition payment of prepetition claims pursuant to section 105(a) in other situations, such as if nonpayment of a prepetition obligation would trigger a withholding of goods or services essential to the debtors' business reorganization plan. *See Ionosphere Clubs*, 98 B.R. at 167-77 (finding that section 105 empowers bankruptcy courts to authorize payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor).

67.     This flexible approach is particularly critical where a prepetition creditor provides vital goods or services to a debtor that would be unavailable if the Debtor did not satisfy its prepetition obligations. In *In re Structurlite Plastics Corp.*, 86 B.R. 922, 931 (Bankr. S.D. Ohio 1988), the bankruptcy court stated that "a bankruptcy court may exercise its equity powers under § 105(a) [of the Bankruptcy Code] to authorize payment of prepetition claims where such payment is necessary, to permit the greatest likelihood of survival of the debtors and payment of

creditors in full or at least proportionately." *Id.* The court explained that "a per se rule proscribing the payment of prepetition indebtedness may well be too inflexible to permit the effectuation of the rehabilitative purposes of the Code." *Id.* at 932.

**2.    The Proposed Payments are Accorded Priority under Section 507.**

68.    Moreover, under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code, all of the Employees' prepetition wages and other benefits and compensation that the Debtors seek to pay under the authority set forth herein would be entitled in any event to priority treatment to the extent of $11,725 for each individual.

69.    "[W]age priority has been a feature of the bankruptcy law since 1898." *In re Garden Ridge Corp.*, No. 04-10324, 2006 WL 521914, at *2 (Bankr. D. Del. March 2, 2006) (quoting 4 Collier on Bankruptcy § 507.05[1] (15th ed.)). "Its purpose is to 'alleviate hardship on workers . . .' who may have no other source of income and 'to encourage employees to stand by an employer in financial difficulty.' This priority extends to certain other 'benefits that are considered akin to compensation, such as vacation, severance and sick leave pay.'" *Id.*

70.    The Debtors' failure to pay these amounts will devastate morale at a critical time in the Debtors' restructuring efforts. In addition, all of these amounts have arisen in the ordinary course of the Debtors' businesses and are reasonable in relation to the value of the services rendered.

**3.    The Proposed Payments are Appropriate under Section 363(b) of the Bankruptcy Code.**

71.    The Court may also grant the relief requested herein pursuant to section 363(b) of the Bankruptcy Code. Section 363 provides that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Under this section, a court may authorize a debtor to pay certain prepetition

claims. *See In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (affirming lower court order authorizing payment of prepetition wage claims pursuant to section 363(b)). To do so, "the debtor must articulate some business justification, other than the mere appeasement of major creditors." *Id.* at 175.

72.     Payment of prepetition compensation in order to preserve and protect a debtor's business by maintaining the morale and dedication of a debtor's workforce is clearly a sufficient business justification. Accordingly, the payments should be permitted.

### 4.     Payment of the Deductions and Payroll Taxes is Appropriate under Section 541 of the Bankruptcy Code.

73.     In addition, as part of the relief requested herein, the Debtors seek authority to pay to the appropriate entities the Deductions and the Payroll Taxes. These amounts principally represent Employee earnings that governments, Employees and judicial authorities have designated for deduction from Employees' paychecks. Indeed, certain Deductions such as contributions to the Employee Benefit Programs, child support payments and garnishments are not the Debtors' property but rather have been withheld from Employees' paychecks on another party's behalf. *See* 11 U.S.C. § 541(b). Moreover, the Debtors and their officers are required by federal or state laws to make certain tax payments that have been withheld from their Employees' paychecks. 26 U.S.C. §§ 6672 and 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95-97 (3d Cir. 1994) (state law requiring debtor to withhold city income tax from its employees' wages created trust relationship between debtor and city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting individual officers of a company may be held personally liable for failure to pay trust fund taxes). Because the Deductions and Payroll Taxes are not property of the Debtors' estates, these amounts are not subject to the normal bankruptcy prohibitions against payment. *See In re*

*Dameron*, 155 F.3d 718, 721 (4th Cir. 1998).  The Debtors therefore request that the Court confirm that such trust fund withholding is not property of the Debtors' estates and that the Debtors may transmit the Deductions and Payroll Taxes to the proper parties in the ordinary course of business.

74.    It is also important to note that at this time, the Debtors do not seek to assume any executory contracts or obligations, and the Motion should not be deemed to be an assumption or adoption of any employee agreements or policies.  Rather, the Debtors merely seek to take steps that they believe to be necessary to keep their existing workforce in tact to maximize the value of the bankruptcy estates.  Also, the Debtors will retain the discretion to not make the payments contemplated by the Motion for particular Employees, and nothing in the Motion shall, in and of itself, confer upon any Employees or other parties an entitlement to administrative priority or other preferences in distribution from the Debtors' estates.

**B.    Cause Exists to Authorize the Debtors' Financial Institutions to Honor Checks and Electronic Fund Transfers**

75.    Under the Debtors' existing cash management system, the Debtors represent that checks, wire transfer requests and ACH payments can be readily identified as relating to an authorized payment in respect of the prepetition claims of the Employees.  Accordingly, the Debtors believe that checks, wire transfer requests and ACH payments, other than those relating to authorized payments, will not be honored inadvertently and that all applicable banks and other financial institutions should be authorized and directed, when requested by the Debtors, to receive, process, honor and pay any and all checks, wire transfer requests and ACH payments in respect of the prepetition claims of the Employees.

C.    **Failure to Honor Employee Obligations Within Twenty-One Days of the Petition Date May Cause Immediate and Irreparable Harm**

76.    Pursuant to Bankruptcy Rule 6003, the Court may grant relief regarding a motion to pay all or part of a prepetition claim that arose before the Petition Date within twenty-one (21) days after the filing of the petition if the relief is necessary to avoid immediate and irreparable harm.

77.    As discussed above, the Employees are integral to the Debtors' business operations. Failure to satisfy obligations with respect to the Employees in the ordinary course of business during the first twenty-one (21) days of these cases will jeopardize the loyalty and trust of the Employees. Certain of the Employees may leave and thereby cause serious disruption to the Debtors' business operations during this critical period when the Debtors need the continued support of their Employees to allow for a successful liquidation and sale of substantially all of their assets for the benefit of creditors.

78.    Moreover, the vast majority of the Debtors' Employees depend on their compensation, benefits and reimbursement of their expenses to continue to pay their daily living expenses. These Employees will be exposed to significant financial difficulties if the Debtors are not permitted to pay the Employees in the ordinary course of business. Accordingly, the Debtors submit that they have satisfied the requirements of Bankruptcy Rule 6003 to support immediate payment of the employee obligations.

**Request for Waiver of Stay**

79.    The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that an "order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." As described above, the relief that the Debtors seek in this Motion is

immediately necessary in order for the Debtors to be able to continue to operate their business and preserve value for the benefit of creditors. The Debtors respectfully request that the Court waive the 14-day stay imposed by Bankruptcy Rule 6004(h), as the critical nature of the relief sought herein justifies immediate relief.

### Notice

80.    The Debtors have provided notice of this Motion to: (a) the Office of the United States Trustee for the District of Delaware; (b) the Office of the United States Attorney for all Districts in which the Debtors conduct business; (c) the Office of the Attorney General for all states in which the Debtors conduct business; (d) the Department of Labor for all states in which the Debtors conduct business; (e) the entities listed on the Consolidated List of Creditors Holding the 20 Largest Unsecured Claims filed by the Debtors pursuant to Bankruptcy Rule 1007(d); (f) counsel to the Investors; (g) counsel to Norwest Mezzanine Partners III, L.P.; (h) the Seller Noteholders; (i) the Convertible Noteholders; (i) the Internal Revenue Service; (j) counsel to Solutions; and (k) ADP, Inc.   In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

### No Prior Request

81.    No prior request for the relief sought in this Motion has been made to this or any other court.

[the remainder of this page has been left intentionally blank]

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto, (i) authorizing, but not directing, the Debtors to pay certain pre-petition amounts for (a) Employee Obligations, Uncashed Checks and Unpaid Compensation, (b) Deductions and Withholdings, (c) Reimbursable Expenses, and (d) the Employee Benefit Programs, and (ii) authorizing and directing banks and other financial institutions to receive, process, honor and pay all checks presented for payment and electronic payment requests relating to the foregoing, and (iii) granting such other and further relief as is just and proper.

Dated:  October 24, 2013

SAUL EWING LLP

_____

Mark Minuti (DE Bar No. 2659)
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE  19899
Telephone: (302) 421-6840
Facsimile: (302) 421-5873

-and-

Jeffrey C. Hampton
Monique Bair DiSabatino
Ryan B. White
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102
Telephone: (215) 972-7777
Facsimile: (215) 972-7725

*Proposed Counsel for Debtors
and Debtors-in-Possession*